# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### KNOXVILLE DIVISION

| | | |
|---|---|---|
| **CARITEN HEALTH PLAN INC.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 14-476** |
| **vs.** | ) | |
| | ) | |
| **MID-CENTURY INSURANCE COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

Plaintiff, Cariten Health Plan Inc., brings this action to determine if the federal courts are powerless to act when a No Fault carrier, like Defendant, Mid-Century Insurance Company, refuses to comply with the federal Medicare Secondary Payer law and shifts its financial obligations under the Medicare Secondary Payer law to Medicare Advantage organizations and ultimately to the Medicare Trust Funds and to elderly and disabled Medicare Advantage enrollees.

## OVERVIEW

1.      Plaintiff, Cariten Health Plan Inc. ("Cariten Health Plan"), is a Medicare Advantage organization ("MA organization").   As such, it provides Medicare benefits to Medicare beneficiaries who elect to enroll in its Medicare Advantage ("MA") plans.  *See* 42 U.S.C. § 1395w-21(a).

2.      Defendant, Mid-Century Insurance Company, provides "no fault" insurance that is responsible for medical expenses in the circumstances set forth in its policies.  As used in this Complaint, "no fault" insurance has the meaning set forth in 42 CFR § 411.50(b) and includes

Personal Injury Protection ("PIP"), Medical Payments ("Med Pay"), and Guaranteed Benefits coverage.

3.     The Medicare Secondary Payer ("MSP") law, 42 U.S.C. § 1395y(b), makes payments under Title XVIII of the Social Security Act, i.e., under Medicare, secondary to "no fault" insurance.

4.     Thus, when Defendant's "no fault" insurance and Medicare benefits would otherwise both be available to pay a Medicare beneficiary's medical expenses, the benefits available under Defendant's "no fault" insurance are, as a matter of federal law, "primary," and the benefits under Medicare are "secondary."  Similarly, when Defendant's "no fault" insurance and the Medicare benefits under an MA plan would otherwise both be available to pay an MA enrollee's medical expenses, the benefits available under Defendant's "no fault" insurance are, as a matter of federal law, "primary," and the benefits under the MA plan are "secondary."

5.     If an MA organization pays Medicare benefits for an MA enrollee's medical expenses, in circumstances in which "no fault" insurance is primary, the MA organization is entitled to have the primary payer, i.e., the "no fault" insurer, make primary payment or appropriate reimbursement.  *See* 42 U.S.C. § 1395y(b)(3)(A).  Alternatively, notwithstanding any other provision of law, the MA organization may charge the primary payer for the services, unrestrained by the usual Medicare fee schedule.  *See* 42 U.S.C. § 1395w-22(a)(4); 42 C.F.R. § 412.108(f).

6.     Plaintiff, Cariten Health Plan, and other companies in the Humana family of companies have repeatedly requested Defendant and other companies in the Farmers Insurance Group to honor their obligations under the MSP law, only to have Defendant and other companies in the Farmers Insurance Group refuse.

2

7.     Defendant, Mid-Century Insurance Company, contends that MA organizations, like Plaintiff, Cariten Health Plan, have no federal cause of action by which to enforce the MSP law or compel primary plans to honor their obligation under the federal Medicare Secondary Payer law. Apparently believing that the federal courts, therefore, are powerless to enforce the MSP law in the context of the Medicare Advantage program, and confident that elected state court judges are unwilling to do so, Defendant, Mid-Century Insurance Company, and other companies in the Farmers Insurance Group, refuse to pay as primary or make appropriate reimbursement when requested to do so by Plaintiff, Cariten Health Plan, and other MA organizations.

8.     Plaintiff, Cariten Health Plan, sues Defendant, Mid-Century Insurance Company, as the "primary payer" with respect to a Medicare Advantage enrollee for whom "no fault" insurance Defendant issued was the primary plan under the MSP law.

9.     Plaintiff, Cariten Health Plan, Inc., brings this action:

(a)     Pursuant to 28 USC § 2201(a), for a declaratory judgment that:

i.     When it covers the same medical expenses as Medicare, the "no fault" or medical payments or similar first party coverage issued by Defendant, Mid-Century Insurance Company, is primary to Medicare, including Medicare benefits advanced by MA organizations such as Plaintiff, Cariten Health Plan;

ii.     When an MA organization such as Plaintiff, Cariten Health Plan, has advanced Medicare benefits in circumstances in which its payments are made secondary, pursuant to 42 U.S.C. § 1395y(b)(2) and § 1395w-22(a)(4), to no fault or medical payments or similar first party coverage provided by Defendant, Mid-Century Insurance Company, then Defendant is obligated to make appropriate reimbursement to the MA organization;

3

iii.     Defendant, Mid-Century Insurance Company, may not avoid its obligations under the MSP law by claiming that, "The HMO's and Medicare + Choice Organizations statutes permit, but do not mandate recovery in MSP situations"; in other words, by claiming that, because federal law says Medicare organizations "may" recover, therefore they have no right to recover; and

iv.     Defendant, Mid-Century Insurance Company, may not avoid its obligations under the MSP law by claiming that its coverage is first party coverage and therefore not subject to "subrogation"; and

(b)     Pursuant to 42 U.S.C. § 1395y(b)(3)(A), to recover double damages for Defendant's failure to pay as primary or to make appropriate reimbursement; or *alternatively*,

(c)     Pursuant to 42 U.S.C. § 1395w-22(a)(4), to recover charges for the items and services its enrollee obtained for which Mid-Century Insurance Company's coverage was the primary plan and Defendant, Mid-Century Insurance Company, the primary payer; and for

(d)     Restitution for all claims payable under no fault, medical payments or other similar first party coverage provided by Defendant, Mid-Century Insurance Company, which Plaintiff, Cariten Health Plan Inc., paid without knowledge that Defendant, Mid-Century Insurance Company, also provided coverage for the medical expense and was the primary payer under the MSP law.

(e)     For an accounting of the reimbursement due Plaintiff, Cariten Health Plan, Inc., from Defendant, Mid-Century Insurance Company, with respect to claims for medical expense for which Plaintiff, Cariten Health Plan, Inc., advanced Medicare benefits and is entitled to appropriate reimbursement from Defendant, Mid-Century Insurance Company.

4

10. Plaintiff, Cariten Health Plan Inc., files this Complaint upon knowledge as to facts pertaining to itself and upon information and belief as to other matters.

## PARTIES

11. Plaintiff, Cariten Health Plan Inc., is a Tennessee corporation with its principal place of business at 2160 Lakeside Centre Way, Knoxville, Tennessee 37922. Plaintiff, Cariten Health Plan, contracts with the Centers for Medicare and Medicaid Services ("CMS") to administer Medicare benefits for Medicare beneficiaries who elect to enroll in Medicare Advantage (Medicare Part C) and Medicare Prescription Drug (Medicare Part D) programs. Plaintiff, Cariten Health Plan, is part of the Humana family of companies.[1]

12. Defendant, Mid-Century Insurance Company, is an insurance company incorporated in California. It has its principal place of business at 4680 Wilshire Boulevard, Los Angeles, California 90010. It is licensed to do business in, and does business in, the State of Tennessee. Defendant, Mid-Century Insurance Company, is part of the Farmers Insurance Group of Companies®.

## JURISDICTION AND VENUE

13. This action arises under the laws of the United States and involves a federal question. The Court therefore has jurisdiction over the subject-matter of this action under 28 U.S.C. § 1331.

14. Alternatively, the Court has supplemental jurisdiction over Counts Three, Four, and Five under 28 U.S.C. § 1367(a).

---

[1] Together, as of June 30, 2014, the Humana companies provided Medicare benefits to 2,363,000 individual Medicare Advantage enrollees and 479,700 group Medicare Advantage enrollees. As of June 30, 2014, the Humana companies also served 3,881,100 Medicare beneficiaries in the company's individual stand-alone Prescription Drug Plans (PDPs).

15.     Venue is proper in the Eastern District of Tennessee, Knoxville Division, because (1) Defendant, Mid-Century Insurance Company, does business in, and thus resides in, this judicial district, and/or (2) because a substantial part of the events or omissions giving rise to this action occurred in this judicial district. 28 U.S.C. § 1391(b) and (c).

## LEGAL BACKGROUND

16.     Medicare is a system of federally funded health insurance for people 65 and older, certain disabled persons, and persons with End Stage Renal Disease.  Congress enacted the Medicare Program as Title XVIII of the Social Security Act ("Medicare Act").  42 U.S.C. § 1395, et seq.  Medicare is an enormous and complex federal program.  As of 2013, Medicare insured over 52 million Americans, including 43.5 million individuals aged 65 and older, and 8.8 million disabled, with total expenditures of $582.9 billion.[2] This suit challenges practices that drain money from the Medicare Trust Funds and increase the costs borne by elderly, and often low-income beneficiaries who enroll in Medicare Advantage plans.

### The ABCs of Medicare

17.     Title XVII of the Social Security Act – commonly called the Medicare Act – is divided into five "Parts."

18.     Part A is automatic and provides hospital and certain other facility benefits.  *See* 42 U.S.C. §§ 1395c to 1395i-5.  Part B provides medical benefits.   Although heavily subsidized by the federal government, Part B is voluntary and requires a small premium from the beneficiary. *See* 42 U.S.C. §§ 1395j to 1395w-4.  Congress refers to Parts A and B as the "Medicare fee-for-

---

[2] *See* 2014 Annual Report of the Boards of Trustees of the Federal Hospital Insurance and Federal Supplementary Medical Insurance Trust Funds, p. 7.

6

service program option."[3]  Because providers are paid based on how many services they provide, with few controls on how many procedures providers may provide, the original Medicare fee-for-service program option has proven to be very expensive.

19.     Medicare Part C creates an alternative option for receiving Medicare benefits, in which private contractors are allowed somewhat more flexibility than Part A and B contractors, but are required to compete against each other and to assume a certain amount of financial risk. *See* 42 U.S.C. §§ 1395w-21 to 1395w-29.  Congress initially called this program "Medicare + Choice." S*ee* Balanced Budget Act of 1997, Pub. L. No. 105-33, Title IV, §§ 4001-4006, 111 Stat. 251, 275-334 (Aug. 5, 1997).  In 2003, Congress strengthened and renamed the program "Medicare Advantage."  S*ee* Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA"), Pub. L. No. 108-173, Title II, §§ 201-241, 117 Stat. at 2176-221.  Congress enacted Medicare Part C in the hope that it would lead to a more efficient and less expensive Medicare program. *See*, *e.g.,* H.R. Rep. No. 105-217, at 585 (1997) (Conf. Rep.) (stating that MA program was intended to "enable the Medicare program to utilize innovations that have helped the private market contain costs and expand health care delivery options").

20.     Medicare Part D is the voluntary prescription drug benefit, added in 2003.  *See* Title I, §§ 101-111, 117 Stat. 2066, 2071-176 (Dec. 8, 2003) (codified at 42 U.S.C. §§ 1395w-101 to 1395w-152).

---

[3]  The Medicare Act repeatedly refers to the "the original medicare fee-for-service program option." *See*, *e.g.,* 42 U.S.C. 1395w-21(c)(3)(A)(i); 42 U.S.C. § 1395w-21(d)(3)(A); 42 U.S.C. § 1395w-212a(1)(A), (B); 42 U.S.C. § 1395w-23(g)(1)(A); 42 U.S.C. § 1395w-24(a)(6)(a)(ii)(I); 42 U.S.C. § 1395w-24(b)(1)(C)(ii)(I); 42 U.S.C. § 1395w-24(b)(2)(E);  42 U.S.C. § 1395w-24(e)(4)(A);  42 U.S.C. § 1395w-27a (b)(1); 42 U.S.C. § 1395w-27a (c)(1)(B)(i); 42 U.S.C. § 1395w-27a (c)(2)(D)(I)(i).

7

21.    The final "Part" of Title XVIII is Medicare Part E, which contains definitions and general provisions applicable to the whole of the Medicare program. *See* 42 U.S.C. §§ 1395x – 1395y.  The Medicare Secondary Payer law, 42 U.S.C. 1395y(b), is codified in Part E.

### Medicare Advantage (Medicare Part C) is Part of Medicare

22.    The Medicare Act guarantees eligible Medicare beneficiaries the right to elect to receive Medicare benefits either through the Original Medicare fee-for-service program option or through the Medicare Advantage option.  *See* 42 U.S.C. § 1395w-21(a).  Medicare beneficiaries may also elect to participate in the voluntary prescription drug program.  *Id.*  About 28% of Medicare beneficiaries chose to enroll in Medicare Advantage plans in 2013.  *See* 2013 Annual Report of the Boards of Trustees of the Federal Hospital Insurance and Federal Supplementary Medical Insurance Trust Funds, p. 6.

23.    The funds for Medicare Advantage benefits come from the Medicare Trust Funds. *See* 42 U.S.C. § 1395w-23(f).  The Medicare Trust Funds expended approximately $123.6 billion to provide Part A and B Medicare benefits through the Medicare Advantage program in 2011.[4] The Medicare Trust Funds expended approximately $137 billion to provide Part A and B Medicare benefits through the Medicare Advantage program in 2012.[5]

24.    Because the Medicare Part C program is a federal program, operated under federal rules and funded by federal dollars, Medicare Part C expressly preempts state law.  *See* 42 U.S.C.

---

[4] 2012 Annual Report of the Boards of Trustees of the Federal Hospital Insurance and Federal Supplementary Medical Insurance Trust Funds, Table IV.C.2 (HI and SMI combined), p. 183.

[5] 2013 Annual Report of the Boards of Trustees of the Federal Hospital Insurance and Federal Supplementary Medical Insurance Trust Funds, Table IV.C.2 (HI and SMI combined), p. 172 (Part A - $70.6 billion; Part B - $66.4 billion. Total: $137.0 billion). These figures do not include Part D benefits included with many MA plans.

§ 1395w-26(c); 42 C.F.R. § 422.402; 42 C.F.R. § 422.108(f). The Conference Committee which finalized the legislation that became Medicare Part C reported:

> The Conferees believe that the Medicare+Choice program will continue to grow and eventually eclipse original fee-for-service Medicare as the predominant form of enrollment under the Medicare program. Under original fee-for-service, the Federal government alone set legislative requirements regarding reimbursement, covered providers, covered benefits and services, and mechanisms for resolving coverage disputes. Therefore, the Conferees intend that this legislation provide a clear statement extending the same treatment to private Medicare+Choice plans providing Medicare benefits to Medicare beneficiaries.

Balanced Budget Act of 1997, P.L. 105-33, H.R. Conf. Rep. 105-217 (July 30, 1997).

25.     In 2003, as part of the MMA, Congress strengthened Medicare Part C preemption by amending §1395w-26(b)(3), replacing the prior preemption provision with the current language, which declares, "[t]he standards established under this part shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to MA plans which are offered by MA organizations under this part." *See* 42 U.S.C. § 1395w-26(b)(3). The Conference Report accompanying the MMA explained that, in amending the preemption provision, Congress intended to broaden the preemptive effects of the Medicare statutory regime: "The conference agreement clarifies that the MA program is a federal program operated under Federal rules. State laws do not, and should not apply, with the exception of state licensing laws or state laws related to plan solvency. There has been some confusion in recent court cases." H.R. Rep. No. 108-391, at 557 (2003) (Conf. Rep.). *See, e.g., Do Sung Uhm v. Humana, Inc.*, 620 F.3d 1134, 1149 (9th Cir. 2010).

## Role of the Secretary, CMS, and Private Contractors

26.     The Secretary ("Secretary") of the U.S. Department of Health and Human Services ("HHS") is the federal officer responsible for administration of the Medicare program. *See* 42

9

U.S.C. § 1395hh(a)(1) and § 1395kk(a). The Secretary regulates the Medicare Part C program in great detail through regulations, the Medicare manuals, and other sub-regulatory guidance. But for most purposes, the Secretary has delegated authority over the Medicare program to a subunit of HHS, the Centers for Medicare and Medicaid Services ("CMS").

27. To provide for the practical, day-to-day administration of the Medicare program, CMS frequently acts through contractors – i.e., private companies performing public functions. By law, "The Secretary may perform any of his functions under this subchapter directly, or by contract providing for payment in advance or by way of reimbursement, and in such installments, as the Secretary may deem necessary." *See* 42 U.S.C. § 1395kk(a). Importantly, the Secretary (through CMS) contracts with MA organizations, 42 U.S.C. § 1395w-27, and pays them "in advance." *See* 42 U.S.C. § 1395w-23(a)(1)(A). Thus, the Secretary (through CMS) may perform any of her functions under Medicare Part C "directly" or "by contract" through contractors, including MA organizations.

28. CMS does not itself process or pay Medicare claims directly. Until recently, private companies, known as "fiscal intermediaries," processed and paid claims under Medicare Part A. *See* 42 U.S.C. § 1395h. Other private companies, known as "carriers," administered Medicare Part B benefits. *See* 42 U.S.C. § 1395u. In 2003, Congress adopted Medicare contracting reforms, which – among other things – required the Secretary to replace fiscal intermediaries and contractors with the new Medicare Administrative Contactors ("MACs"). *See* 42 U.S.C. § 1395kk-1 (Medicare Prescription Drug, Improvement, and Modernization Act of 2003, § 911).

29. In an effort to make the traditional program more efficient, CMS also distributed some of the responsibilities previously handled by fiscal intermediaries and carriers to other contractors. Before Medicare contracting reform, for example, fiscal intermediaries and carriers

10

were responsible for coordination of Medicare Part A and B benefits under the Medicare Secondary Payer ("MSP") law and regulations (discussed in greater detail below). *See, e.g., Woods v. Empire Health Choice, Inc.*, 574 F.3d 92 (2d Cir. 2009); *United States ex rel. Drescher v. Highmark, Inc.*, 305 F. Supp. 2d 451, 454 (E.D. Pa. 2004). Since 2006, CMS has moved much of that work to other contractors.

30. Specifically, CMS uses the following contractors to perform its MSP administrative activities in the context of the Original Medicare fee-for-service option: the Coordination of Benefits Contractor (COBC), the Benefits Coordination & Recovery Center (BCRC), and the Workers' Compensation Review Contractor (WCRC). Their responsibilities are as follows:

• ***COBC***: The COBC collects, manages, and maintains information in the CMS data systems about other health insurance coverage for Medicare beneficiaries and initiates MSP claims investigations. The information the COBC collects is available to other CMS contractors.
• ***BCRC***: The BCRC is responsible for ensuring that Medicare gets repaid for any conditional payments it makes related to a liability, no-fault, or workers' compensation claim. A conditional payment is a payment Medicare makes for services another payer may be responsible for. The payment is "conditional" because it must be repaid to Medicare when a settlement, judgment, award, or other payment is made.

• ***WCRC***: The WCRC evaluates proposed Worker's Compensation Medicare Set-Aside ("WCMSA") amounts and projects future medical expenses related to workers' compensation accident, injury, or illness situations that would otherwise be payable by Medicare.

GAO-12-333, Medicare Secondary Payer, pp. 7 – 8 (March 2012).

31. In the context of the Medicare Advantage or Medicare Part C program, the COBC performs the same functions as in Original Medicare. CMS, however, delegates responsibility for the functions performed by the **BCRC** and WCRC to MA organizations. Thus, the Secretary (through CMS) contracts with and delegates to MA organizations the right and responsibility to collect from primary payers using the same procedures as in Original Medicare fee-for-service

11

option.  *See* 42 C.F.R. § 422.108(f); CMS, Memorandum: Medicare Secondary Payment Subrogation Rights (Dec. 5, 2011).[6]

32.     Under the Medicare Advantage option, public and private organizations administer Medicare benefits under contracts with the Secretary.  Those contractors are known as Medicare Advantage organizations ("MA organizations" or "MAOs").  *See* 42 U.S.C. §1395w-21(a)(1). Plaintiff, Cariten Health Plan Inc., is an MA organization.

**MA Organizations Function as Government Contractors, Not as Private Insurers**

33.     The Secretary controls MA organizations through the bid process, through its contracts with the organization, through audits, and through the threat of intermediate sanctions and contract termination.  The Secretary (through CMS) determines to whom to award Medicare Advantage contracts.  The Secretary (through CMS) reviews and approves or rejects annual bids. The Secretary (through CMS) sets the rates to be paid to MA organizations.  The Secretary (through CMS) has approval authority over all marketing materials used by MA organizations. Subject to judicial review, the Secretary has the final determination on beneficiary and provider appeals.  The Secretary (through CMS) provides directions and instructions to MA organizations on a nearly daily basis.

34.     As one court aptly summarized the situation, "In order to accomplish the legislative goals, it was necessary for CMS to contract with private companies to provide the new health plan choices under the new provisions of Medicare Part C.  The government pays private companies like Humana to provide these new health plan choices.  As part of the contract and pursuant to federal law, these Medicare Advantage plans are regulated, monitored, and directly controlled by

---

[6]  http://www.cms.gov/Medicare/Health-PlansHealthPlansGenInfo/downloads/21_MedicareSecondaryPayment.pdf.

CMS, including the disenrollment procedures and premium adjustments." *Mann v. Reeder,* 2010 U.S. Dist. LEXIS 134821 (W.D. Ky. 2010).

35.     In order to qualify to contract as a MA organization, entities must demonstrate that they have sufficient financial and administrative capacity to fulfill their obligations under the contract with CMS. Applicants do this, in part, by obtaining a license as a risk-bearing organization under state laws regulating insurers, health maintenance organizations, service benefit organizations, or provider-sponsored organizations. *See* 42 U.S.C. § 1395w-25(a)(1). Although MA organizations are required to be licensed as risk-bearing entities under state law, they do not administer Medicare benefits under their state licenses; they administer Medicare benefits under federal law and their contracts with CMS.

36.     Eligible Medicare beneficiaries elect to enroll in a Medicare Advantage plan by making an election during the annual, year-end open enrollment period or during individual-specific special enrollment periods (*e.g.*, as when an individual first becomes eligible for Medicare). Medicare beneficiaries elect to enroll in a Medicare Advantage plan by completing an election form and giving it to the MA organization, which the organization then transmits to CMS. *See* 42 U.S.C. §1395w-21(c). Medicare Part C requires the Secretary to provide information concerning options to Medicare beneficiaries, and it requires MA organizations to provide detailed information to enrollees. *See* 42 U.S.C. §1395w-21(d). The Secretary (through CMS) requires MA organizations to provide that detailed information in a disclosure document, written by CMS, which CMS calls the "Evidence of Coverage."

37.     There is no Medicare Advantage "insurance policy." Medicare Part C does not require Medicare beneficiaries to sign an application for insurance, nor does it require Medicare Advantage enrollees to terminate or cancel an insurance policy to discontinue receiving benefits

through a Medicare Advantage plan. Medicare Part C does not require a MA organization to issue a Medicare Advantage insurance policy. Although discussed in certain decisions as if it actually existed, the Medicare Advantage "insurance policy" is a judicial invention.

38. Consistent with the fact that the benefits are Medicare benefits, Medicare Advantage enrollees who do not receive a health service to which they believe they are entitled or who believe they have been charged more than appropriate may pursue the Medicare administrative appeals process. *See* 42 U.S.C. § 1395w-22(g)(5); 42 C.F.R. § 422.560 *et seq*. Subject to a modest jurisdictional amount, a Medicare Advantage enrollee who believes that the MA organization has improperly denied benefits or charged more than appropriate may seek judicial review in federal court of the Secretary's final decision. *See* 42 U.S.C. § 1395w-22(g)(5) and 42 U.S.C. § 405(g). The appeal process is exclusive. *See* 42 U.S.C. § 405(h). Those provisions require that challenges to MSP determinations be pursued through the Medicare appeals process. *See, e.g.*, *Einhorn v. CarePlus Health Plans*, Case No. 14-61135, 2014 WL 4385912 (S. D. Fla. Sept. 3, 2014); *Cupp v. Johns and Humana Ins. Co.*, Case No. 2:14-cv-02016, 2014 WL 916489 (W.D. Ark. Mar. 10, 2014); *Potts v. Rawlings Co., LLC,* 897 F. Supp. 2d 185, 191 (S.D.N.Y. 2012); and *Phillips v. Kaiser Foundation Health Plan, Inc*., No. C 11-02326, 2011 WL 3047475 (N.D. Cal. July 25, 2011).

39. CMS pays MA organizations and delegates to them the obligation to administer, pay, and assume Medicare's economic risk for the Medicare benefits provided to Medicare Advantage enrollees, all pursuant to the requirements of Medicare Part C and CMS regulations. The amount paid to the MA organization is carefully calibrated, taking into account such factors as the geographic location, age, disability status, gender, institutional status, and health status of *each* Medicare Advantage enrollee, so as to ensure actuarial equivalence with the Original

Medicare fee-for-service program option. *See* 42 U.S.C. § 1395w-23(c). The amount paid to the MA organization is based in large part on the medical expense incurred by the MA plan in one year (the base year), projected forward actuarially. Medicare Secondary Payer savings reduce medical expense in the base year and thus reduce the amount Medicare Trust Funds pay the MA organization in the downstream year. Therefore, medical expenses avoided or recovered by an MA organization—such as the reimbursements sought in this action—are returned to the Medicare Trust Funds in the form of lower payments by the Trust Funds in the downstream year. *See* HHS, *Medicare Program; Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs*, 75 Fed. Reg. 19,678, 19,797 (April 15, 2010); HHS, *Medicare Program; Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs*, 74 Fed. Reg. 54,634, 54,711 (October 22, 2009).

40. Currently, there are over 16 million persons enrolled in Medicare Advantage plans nationally. More than 37 million persons are enrolled in Medicare prescription drug plans (PDPs), either on a stand-alone basis or in connection with a Medicare Advantage plan.

41. The size and expense of the Medicare Advantage program makes it important that casualty companies, like those in the Farmers Group of Companies®, do not deflect their financial obligations under the Medicare Secondary Payer law onto MA organizations and ultimately onto the Medicare Trust Funds.

**Medicare Advantage Organizations
And the Medicare Secondary Payer Law**

42. In 1980, in response to skyrocketing costs, Congress began enacting the provisions that now comprise the MSP law, 42 U.S.C. § 1395y(b). The primary intent underlying the MSP provisions is to shift the financial burden of health care from the Medicare program to private insurers, like Mid-Century Insurance Company, and thereby lower the cost of the Medicare

15

program. *See*, *e.g.*, *Bio-Medical Applications of Tennessee, Inc. v. Central States*, 656 F.3d 277 (6th Cir. 2011), *pet. for cert. dismissed*, *Central States v. Bio-Medical in re Tenn.*, 132 S. Ct. 1087 (2012); *Farmers Ins. Exch. v. Forkey*, 764 F. Supp. 2d 1205 (D. Nev. 2010); *Smith v. Farmers Ins. Exch. and Mid-Century Insurance Company*, 9 P.3d 335, 341 (Colo. 2000).

43.     By its terms, as enacted in § 1862(b)(2) of the Social Security Act, the MSP law applies to all payments made "under this title," referring to Title XVIII of the Social Security Act, i.e. to the whole Medicare program. In fact, § 1862(b) is codified as 42 U.S.C. § 1395y(b) in Part E of Title XVIII, the Part that contains definitions and other general provisions pertaining to the Medicare program as a whole. When § 1862(b)(2) of the Social Security Act was codified as § 1395y(b)(2) in the United States Code Annotated, the words "under this title" were changed to "under this subchapter," referring to Chapter 7, Subchapter K of Title 42 of the United States Code. There is no substantive difference.

44.     Moreover, when Congress enacted Medicare Part C, Congress indicated that when payment by the MA organization "is *made secondary* pursuant to section 1395y(b)(2)," the MA organization may avoid MSP expense by charging, or authorizing the actual provider to charge, for the items and services covered by the primary plan. 42 U.S.C. §1395w-22(a)(4) (emphasis added). In doing so, Congress expressed its understanding and intention that the MSP law applied to Medicare Part C.

45.     The MSP law creates a federal coordination of benefits scheme, in which worker's compensation, liability insurance (and self-insurance), and no fault insurance are primary, and Medicare benefits are secondary. *See* 42 U.S.C. § 1395y(b)(2); 42 C.F.R. § 422.108(b)(3). *Appalachian Regional Healthcare v. Shalala*, 131 F.3d 1050 (D.C. Cir. 1997); *Agency Information Collection Activities: Submission for OMB Review; Comment Request*, 78 Fed. Reg. 50,057,

50,060 (Aug. 16, 2013) ("Medicare Secondary Payer (MSP) is essentially the same concept known in the private insurance industry as coordination of benefits; it refers to those situations where Medicare assumes a secondary payer role to certain types of private insurance for covered services provided to a Medicare beneficiary.").

46.     By regulation, CMS defines "no fault" insurance to include a variety of insurance plans, including not only automobile "no fault" insurance, but also "medical payments coverage," "personal injury protection," and "medical expense coverage":

> *No-fault insurance* means insurance that pays for medical expenses for injuries sustained on the property or premises of the insured, or in the use, occupancy, or operation of an automobile, regardless of who may have been responsible for causing the accident. This insurance includes but is not limited to automobile, homeowners, and commercial plans. It is sometimes called "medical payments coverage", "personal injury protection", or "medical expense coverage".

42 C.F.R. § 411.50(b).  All references in this Complaint to "no fault" insurance include the full range of insurance described by 42 C.F.R. § 411.50(b), including, but not limited to, the insurance commonly referred to as No Fault, PIP, Med Pay or Guaranteed Benefits.

**Prompt Payment Requirements Preclude Intensive Prepayment Investigation of Every Claim for the Possibility of Other Coverage**

47.     Nearly all health claims, including Medicare Advantage claims, are submitted by providers.  Most such claims are submitted electronically.  As required by law, regulation, contract, or convention, provider claims contain standardized data sets.  For Medicare claims, CMS provides specific instructions to providers regarding billing and claims submission.

48.     If the services are related to an automobile accident, the provider is responsible for ascertaining whether coverage under No Fault insurance is available.  If, during the 120 days following the date on which it provided services, a provider learns that No Fault insurance may

pay for services otherwise covered by Medicare, it must bill the insurance company as primary insurer. *See Medicare Secondary Payer Manual*, Ch. 3, § 30.2.1 (Rev. 37, 10-14-05). If the No Fault insurer will not pay promptly, the provider may bill Medicare for conditional payment.

49.     Health claims, including Medicare Advantage claims, are processed electronically. The Humana companies (including Cariten Health Plan), for example, processed over 110 million health claims and encounters in 2013, including more than 88 million Medicare Advantage claims and encounters.

50.     MA organizations must process and pay or deny claims promptly to comply with the specific requirements established by federal law, *see* 42 U.S.C. § 1395w-27(f), federal regulation, *see* 42 C.F.R. §§ 422.214 and 422.520, and by the terms of their contracts with CMS. Under those requirements, for example, 95% of all clean claims submitted by non-participating, i.e., non-contracted, providers must be paid or denied within 30 days of receipt. *See* 42 C.F.R. § 422.520(a)(1). All other claims submitted by non-participating providers must be paid or denied within 60 days of receipt. *See* 42 C.F.R. § 422.520(a)(3). For participating – i.e., contracted – providers, MA organizations must comply with the terms of their contracts with those providers. Those contracts must address "prompt payment" of provider claims and may impose time limits more stringent than the statutory or regulatory minimum requirements.

51.     Plaintiff, Cariten Health Plan, screens for claims that should not be paid because another plan is primary, but its ability to do so is limited by the completeness and accuracy of the data submitted with the claim. For example, and as discussed below, the providers did not indicate the presence of No Fault insurance or other primary insurance on the claims which Plaintiff, Cariten Health Plan, conditionally paid and for which it seeks reimbursement in this action.

52.     MA organizations are not able to investigate, prior to payment, the facts and circumstances of all medical claims submitted by providers to determine if automobile, premises, drug product liability, or other sources of payment may be available and should pay as primary, and still pay or deny claims within the applicable "prompt payment" time limits.

53.     When a Medicare Advantage Organization makes a payment for medical services that are the responsibility of a primary plan under the Medicare Secondary Payer law, those payments are conditional, whether the MA Organization knew about the primary payer or not. Federal regulations define the term "conditional payment" under the MSP law to mean "a Medicare payment for services for which another payer is responsible, made either on the bases set forth in subparts C through H of this part, *or because the intermediary or carrier did not know that the other coverage existed*." 42 C.F.R. § 411.21 (emphasis added).

### Avoidance *and* Recovery

54.     Under the Medicare Secondary Payer regulations, "Medicare benefits are secondary to benefits payable by a primary payer even if State law or the primary payer states that its benefits are secondary to Medicare benefits or otherwise limits its payments to Medicare beneficiaries." 42 C.F.R. § 411.32(a)(1).

55.     As with any system of coordination of benefits, the Medicare Secondary Payer regime involves both avoidance and recovery. Optimally, when items and services are covered by both a primary plan and by Medicare benefits, Medicare beneficiaries inform their providers of the existence of the primary plan, and the providers submit their charges to the primary payer. If the primary payer pays as required by its insurance contract, Medicare *avoids* the expense of paying those charges.

56.     Sometimes, however, Medicare beneficiaries do not inform their providers of the primary coverage.  For example Defendant, Mid-Century Insurance Company, often insures persons who are considered substandard risks and who may fear that making claims against their coverage may lead to higher auto insurance premiums or loss of coverage.  Even when beneficiaries do inform their providers of the primary plan, the circumstances may be such that the primary plan may not be expected to pay promptly.  In still other cases, beneficiaries may inform their provider of the existence of a primary plan, but the provider may fail to indicate on its claim forms that Medicare's liability may be secondary to the primary plan's.  In each instance, Medicare may pay and seek to *recover* from the primary plan.  *See* 42 U.S.C. § 1395y(b)(2), (b)(3)(A).

57.     Because Medicare Advantage is simply another option for Medicare beneficiaries to receive Medicare benefits, CMS requires MA organizations to advance Medicare benefits under these circumstances.  *See* CMS, *Medicare Managed Care Manual*, Chap. 4, § 130.3 (Rev. 107, 06-22-12) ("In the case of the presence of workers compensation, no-fault and liability insurance (including self-insurance), Medicare makes conditional payments if the other insurance does not pay promptly.  These conditional payments are subject to recovery when and if the other insurance does make payment.  MAOs cannot withhold primary payment unless there is a reasonable expectation that another insurer will actually promptly pay primary to Medicare.").

58.     CMS has interpreted the MSP law as it applies to MA organizations in a formal regulation, 42 C.F.R. § 422.108, which states that MA organizations may exercise the same rights to recover from a primary plan, entity or individual, as the Secretary exercises under the relevant MSP regulations.  Specifically, in § 422.108(f), CMS states:

> **(f) MSP rules and State laws.** Consistent with § 422.402 concerning the Federal preemption of State law, the rules established under this section supersede any State laws, regulations, contract requirements, or other standards that would otherwise apply

to MA plans. A State cannot take away an MA organization's right under Federal law and the MSP regulations to bill, or to authorize providers and suppliers to bill, for services for which Medicare is not the primary payer. The MA organization will exercise the same rights to recover from a primary plan, entity, or individual that the Secretary exercises under the MSP regulations in subparts B through D of part 411 of this chapter.

59.     CMS understands this regulation "to assign MAOs 'the right (and responsibility) to collect' from primary payers using the same procedures available to traditional Medicare." CMS, Memorandum: Medicare Secondary Payment Subrogation Rights (Dec. 5, 2011).

60.     The Secretary has congressional authority to promulgate rules and regulations interpreting and implementing Medicare-related statutes. *See* 42 U.S.C. §§ 1395hh(a)(1) and 1395w-26(b)(1). If Congress has not "directly addressed the precise question at issue," the agency's reading is controlling, unless it is "arbitrary or capricious in substance, or manifestly contrary to the statute." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467* U.S. 837 (1984); *Sebelius v. Auburn Reg'l Med. Ctr.*, 133 S.Ct. 817, 826 (2013) ("A court lacks authority to undermine the regime established by the Secretary unless her regulation is 'arbitrary, capricious, or manifestly contrary to the statute.'").

61.     Representatives of Defendant, Mid-Century Insurance Company, dispute the Secretary's interpretation. Defendant, Mid-Century Insurance Company, however, has not obtained permission from any of its insureds, who are Medicare Advantage enrollees, to appeal on their behalf to challenge the organization determinations of Plaintiff, Cariten Health Plan, or any MA organization, and has not in fact appealed any such determination. Moreover, Defendant, Mid-Century Insurance Company, has not sued the Secretary under the Medicare Act to challenge her interpretation. *See* 42 U.S.C. 1395w-22(g)(5); 42 U.S.C. § 405(g). As to Defendant, Mid-

21

Century Insurance Company, the regulation, therefore, has the force of law and may not be collaterally challenged in this action. *See* 42 U.S.C. § 405(h).

## Avoidance

62.     Under the original Medicare fee-for-service program option, when a primary plan, such as worker's compensation or no fault insurance, is available and may be expected to pay promptly, providers generally bill the primary plan. *See* 42 C.F.R. § 411.40 and § 411.50(c). When they do, Medicare ***avoids*** paying the expenses covered by the primary plan.

63.     To encourage providers to bill primary plans, federal regulations make clear that, when Medicare is secondary, providers are not limited by Medicare rates and may charge the primary plan their usual charges; absent other legal or contractual restraints, the providers may expect to be paid their full charges. *See* 42 C.F.R. § 411.21(b) ("With respect to workers' compensation plans, no-fault insurers, and employer group health plans, a provider or supplier may bill its full charges and expect those charges to be paid unless there are limits imposed by laws other than Title XVIII of the Act or by agreements with the primary payer."). *See*, *e.g., Smith v. Farmers Ins. Exch. and Mid-Century Insurance Company*, 9 P.3d 335, 341 (Colo. 2000).

64.     When Congress enacted Medicare Part C, Congress provided that, when Medicare benefits are secondary, MA organizations and their providers may similarly ***avoid*** MSP expense by charging, or authorizing the provider to charge, the primary plan. *See* 42 U.S.C. § 1395w-22(a)(4); 42 C.F.R. § 422.108(f).

65.     Congress also provided that, when Medicare benefits are secondary, MA organizations may charge, or authorize providers to charge, primary plans in accordance with the rates paid by the primary plan, i.e., without regard to the usual Medicare rates. Specifically, Congress provided that, when Medicare benefits are "made secondary pursuant to section

1395(y)(b)(2)," the MA organization may "charge or authorize the provider of such services to charge" the insurer, "in accordance with the charges allowed under its policy." 42 U.S.C. § 1395w-22(a)(4).

66.     As more fully alleged below, Plaintiff, Cariten Health Plan, provided or arranged for the provision of items and services for its enrollee, for which the Mid-Century Insurance Company policy was the primary plan.  Plaintiff, Cariten Health Plan, is therefore entitled, *notwithstanding any other provision of law*, to charge Defendant, Mid-Century Insurance Company, in accordance with the charges generally allowed under its policy without regard to the Medicare fee schedule.  *See* 42 U.S.C. § 1395w-22(a)(4); 42 C.F.R. § 422.108(f).

67.     Plaintiff, Cariten Health Plan, has charged Defendant, Mid-Century Insurance Company, for those services, but Defendant, Mid-Century Insurance Company, has refused to make appropriate reimbursement to Plaintiff, Cariten Health Plan.

### Recovery

68.     In the event a primary plan fails to pay as primary or make appropriate reimbursement, 42 U.S.C. § 1395y(b)(3)(A) authorizes a private cause of action to recover double damages from the primary plan.  An MA organization that has advanced Medicare benefits has standing to bring the private cause of action.  *In re Avandia Mktg.*, 685 F.3d 353 (3d Cir. 2012).

69.     Plaintiff, Cariten Health Plan, has standing under 42 U.S.C. § 1395y(b)(3) to bring this private cause of action to recover double damages from the primary payer, Defendant, Mid-Century Insurance Company, because it made payments of Medicare benefits on behalf of its MA enrollee, Enrollee 1, for which Defendant, Mid-Century Insurance Company, was primarily liable and for which it did not reimburse Plaintiff, Cariten Health Plan.

23

70.     When Medicare Advantage plans recover reimbursement from primary plans or other liable parties pursuant to the MSP law, those recoveries help reduce Medicare expenditures by the Medicare Trust Funds.  *See* HHS, *Medicare Program; Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs*, 75 Fed. Reg. 19678, 19797 (April 15, 2010) ("MA organizations that faithfully pursue and recover from liable third parties will have lower medical expenses.").  *See also* HHS, *Medicare Program; Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs***,** 74 Fed. Reg. 54,634, 54,711 (October 22, 2009).

71.     Thus, MSP recoveries by MA organizations fulfill the essential purpose of the MSP law – shifting expense from the Medicare program to primary payers (who, in Mid-Century's case, have received premiums to provide no-fault coverage).  *See In re Avandia Mktg.*, 685 F.3d at 363.

### MA Organizations May Exercise the Same Rights as the Secretary

72.     Alternatively, 42 U.S.C. § 1395y(b)(2)(B)(iii) allows the federal government to bring the otherwise private cause of action for double damages created by 42 U.S.C. § 1395y(b)(3)(A).  Consistent with this, 42 C.F.R. § 411.24(c)(2) provides that, "If it is necessary for CMS to take legal action to recover from the primary payer, CMS may recover twice the amount specified in paragraph (c)(1)(i) of this section."   (The amount specified in paragraph (c)(1)(i) is, "The amount of the Medicare primary payment.")

73.     Under 42 C.F.R. § 422.108(f), an "MA organization will exercise the same rights to recover from a primary plan, entity, or individual that the Secretary [i.e., CMS] exercises under the MSP regulations . . .. "

74.     Thus, Plaintiff, Cariten Health Plan, has standing under 42 U.S.C. § 1395y(b)(2)(B)(iii) and § 1395y(b)(3), because the federal government has delegated

responsibility for coordination of benefits with respect to Medicare benefits under the Medicare Advantage option to MA organizations, such as Plaintiff, Cariten Health Plan. *See* 42 C.F.R. § 422.108(f). *See also* CMS, Memorandum: Medicare Secondary Payment Subrogation Rights (Dec. 5, 2011).

## FACTUAL ALLEGATIONS

### Mid-Century Representatives Uniformly Reject Medicare Advantage Requests for Reimbursement

75. When, after paying a Medicare Advantage claim, Plaintiff, Cariten Health Plan, learns of facts and circumstances suggesting that other coverage, not identified in the claim submission, may be available, Plaintiff, Cariten Health Plan, conducts an investigation. If Plaintiff is able to confirm the existence of primary coverage, Plaintiff requests payment or appropriate reimbursement.

76. When Defendant, Mid-Century Insurance Company, provided no fault, medical payments or other first party coverage that insured against the medical expenses in question, Plaintiff's request for payment or appropriate reimbursement is typically referred to the Farmers National Document Center in Oklahoma City, Oklahoma.

77. In such cases, it is usually clear that the Defendant's "no fault," medical payments, or other first party coverage is the primary plan, and that Defendant is the primary payer. The representatives at the Farmers National Document Center in Oklahoma City are well trained. They understand that the Farmers insurance companies are the primary payers (vis-à-vis Medicare Advantage plans) under 42 U.S.C. § 1395y(b) and 42 U.S.C. § 1395w-22(a)(4). The Farmers representatives are careful not to deny that the Farmers coverage is the primary plan.

78. Instead, the Farmers' representatives reject Medicare Advantage requests for payment or reimbursement by Plaintiff, or its corporate affiliates, on other grounds. Sometimes

25

the Farmers representatives reject reimbursement on grounds that Medicare Advantage organizations (i) do not have the same recovery rights as the government, or (ii) have only a "permissive" right to recovery and therefore may not recover, or (iii) or a similar reason.

79.     On other occasions, as with the incident detailed below, the Farmers representatives deny the request for payment or reimbursement by Plaintiff, Cariten Health Plan, or its corporate affiliate, on the ground that the Farmers' coverage is first party coverage and therefore is not subject to "subrogation."  Defendant's representatives assert this as a basis for denying Plaintiff's claim even when the representative for Plaintiff, or its corporate affiliates, takes pains to explain that the Humana company is *not* asserting claim for "subrogation," but instead is asserting its rights under the Medicare statutes and regulations.

80.     In addition to the specific claim identified below, Plaintiff, Cariten Health Plan, believes that Plaintiff and its Humana affiliates, have paid many more claims when no fault insurance sold by Defendant was the primary plan under the MSP law.

**Event No. 3360946[7]**
**Farmers Claim Unit Number 1022446016-1-2**

81.     Enrollee 1 is a Medicare beneficiary who resides in, and at the time of the events giving rise to this action resided in, Greeneville, TN.  The name of Enrollee 1 is known to Defendant, Mid-Century Insurance Company, but is not pled in this Complaint to protect her privacy.

82.     Enrollee 1 elected to obtain her Medicare benefits through participation in a Medicare Advantage plan administered by Plaintiff, Cariten Health Plan, commencing on January 1, 2011, and continuing through all times relevant to this Complaint.

---

[7] This event number refers to the classification of the event in Plaintiff's records only.

83. Enrollee 1 was injured in an automobile accident in Greeneville, Tennessee, on or about October 17, 2012. She obtained treatment for the injuries she sustained from providers whose identities have been disclosed to Defendant, Mid-Century Insurance Company. Their charges for the treatment for the injuries Enrollee 1 sustained in the automobile accident were at least $55,378.70.

84. The providers for Enrollee 1 did not indicate on their claims that No Fault insurance or other primary coverage was available. Plaintiff, Cariten Health Plan, therefore, had no reasonable expectation that No Fault insurance would pay, promptly or otherwise, the expenses incurred by Enrollee 1. Accordingly, Plaintiff, Cariten Health Plan, processed and paid the claims in accordance with its own Medicare prompt payment obligations. The payments made by Plaintiff, Cariten Health Plan, were, as a matter of law, conditional payments. *See* 42 C.F.R. § 411.21.

85. At the time of her motor vehicle accident on October 17, 2012, Enrollee 1 was insured under Policy No. 0192574324 issued by Defendant, Mid-Century Insurance Company. That policy included first party coverage under which Defendant, Mid-Century Insurance Company, agreed, subject to the terms and limitations of the policy, to pay the reasonable expenses incurred for necessary medical expenses resulting from a motor vehicle accident.

86. The first party contract between Defendant, Mid-Century Insurance Company, and its insured, Enrollee 1, in effect on October 17, 2012, constituted "no fault" insurance as term is defined by CMS in 42 C.F.R. § 411.50(b).

87. With respect to the medical care resulting from Enrollee 1's motor vehicle accident, the first party coverage issued by Defendant, Mid-Century Insurance Company, was the primary

plan and the Medicare Advantage plan administered by Plaintiff, Cariten Health Plan, was the secondary plan.

88.     Defendant, Mid-Century Insurance Company, does not dispute that it would have paid the charges submitted by Enrollee 1's providers, up to a reasonable amount for the items and services in question, subject to the dollar limitations of its coverage, if those providers had promptly submitted their claims to Defendant, Mid-Century Insurance Company, together with such documentation as Defendant, Mid-Century Insurance Company, customarily requires in such circumstances.

89.     Aside from coinsurance and copayment amounts totaling $315.00, Plaintiff, Cariten Health Plan, fully discharged Enrollee 1's payment obligation for the items and services for which Enrollee 1's providers charged $55,378.70.  By virtue of its provider discounts and certain features of the Medicare Advantage program, Plaintiff, Cariten Health Plan, was able to do so by making payments of Medicare benefits in the amount of $15,799.43.

90.     The first party coverage issued by Defendant, Mid-Century Insurance Company, was the primary plan and the Medicare Advantage plan administered by Plaintiff, Cariten Health Plan, was the secondary plan with respect to the medical expenses resulting from Enrollee 1's motor vehicle accident on October 17, 2012.

91.     At the time it made payment for these medical expenses, Plaintiff, Cariten Health Plan, was unaware of the existence of the primary coverage issued by Defendant, Mid-Century Insurance Company.  Plaintiff's payments for Enrollee 1's medical expenses were therefore "conditional" payments within the meaning of the MSP Act.  *See* 42 C.F.R. § 411.21.

92.     After making prompt, conditional payments to Enrollee 1's providers, Plaintiff, Cariten Health Plan, subsequently learned of the existence of Enrollee 1's no-fault coverage from Defendant, Mid-Century Insurance Company.

93.     Through its representative, Plaintiff, Cariten Health Plan, notified Defendant, Mid-Century Insurance Company, that it had paid Medicare benefits on behalf of Enrollee 1, but that under the MSP law, the coverage issued by Defendant, Mid-Century Insurance Company was the primary plan, and that Defendant, Mid-Century Insurance Company, was therefore the primary payer.  Plaintiff, Cariten Health Plan, requested payment from Defendant, Mid-Century Insurance Company.

94.     Representatives of Plaintiff, Cariten Health Plan, wrote to Defendant, Mid-Century Insurance Company, on more than one occasion.   For example, on December 13, 2012, its representative wrote:

> We provide Medicare Advantage coverage to the above Covered Person. We have been advised that our Covered Person may have a claim against no-fault insurance, liability insurance, other insurance coverage or a third party for services or supplies related to the above-referenced loss.
>
> Please note that the Plan is a Medicare Advantage Plan and, thus, is governed by the Medicare statutes and regulations. The same Medicare Secondary Payer priority rules apply as in traditional Medicare. We are entitled to be reimbursed when we have paid or provided benefits to the Covered Person due to an injury, illness or condition and another party or insurance carrier is responsible for payment of the Covered Person's medical expenses or benefits. The pertinent provisions governing a Medicare plan's right of recovery can be found at 42 U.S.C. § 1395w-22 (a)(4), and 42 C.F.R. 422.108. These provisions preempt state laws and regulations.
>
> Our recovery and reimbursement rights under the Medicare Secondary Payer rules apply to any amount now due or which may hereafter become payable out of any recovery or recoveries collected or to be collected by the Covered Person, whether by judgment, settlement, compromise, or any other type of recovery,

29

> from any party. No settlement of the claim should be made prior to notifying us of the potential settlement and reaching an agreement for full reimbursement of all related benefits paid.

Its December 13, 2012 letter made no reference to a "subrogation" claim.

95.     Defendant, Mid-Century Insurance Company, responded with a form letter used by the Farmers National Document Center in Oklahoma City, Oklahoma. Even though Plaintiff, Cariten Health Plan, had not asserted "subrogation" rights, Defendant, Mid-Century Insurance Company, responded that its coverage was first party coverage, and therefore, Plaintiff, Cariten Health Plan had no "subrogation" rights.  Under the Farmers logo, the January 10, 2013 letter stated:

> We have received your recent letter placing us on notice of your subrogation rights for benefits payable under the Medical coverage of the above-referenced policy. Your request for reimbursement is denied.  The circumstances do not support a valid subrogation lien.
>
> We have a first party contract with our insured to pay reasonable expenses incurred for necessary medical expenses resulting from a motor vehicle accident. We have found no authority that will allow a health insurance carrier or their representative to claim a direct cause of action against a first party automobile insurance carrier providing PIP [Personal Injury Protection], Med Pay or Guaranteed Benefits.

96.     The Farmers National Document Center in Oklahoma City, Oklahoma, routinely uses this form letter to respond to requests from MA organizations for payment under the MSP law, both when responding on behalf of Mid-Century Insurance Company and when responding on behalf of other companies in the Farmers Group of Companies®.

97.     Defendant, Mid-Century Insurance Company, did not make primary payment for the services provided Enrollee 1 in connection with the injuries she received in her October 17, 2012 auto accident.

98.     Defendant, Mid-Century Insurance Company, has likewise not made appropriate

reimbursement of the payments of Medicare benefits advanced by Plaintiff, Cariten Health Plan, for the services provided Enrollee 1 in connection with the injuries she received in her October 17, 2012 auto accident.

99.     Plaintiff, Cariten Health Plan, has not been reimbursed for the payments it made.

## COUNT ONE

### DECLARATORY JUDGMENT
### AS TO DEFENDANT'S OBLIGATION TO REIMBURSE
### MEDICARE BENEFITS

100.     Plaintiff, Cariten Health Plan, incorporates by reference the allegations of paragraphs 1 through 99 of the Complaint as if set forth herein.

101.     An actual controversy exists between the parties, in that CMS requires MA organizations, including Plaintiff, Cariten Health Plan, to faithfully pursue MSP savings, but Defendant, Mid-Century Insurance Company, denies that Plaintiff, Cariten Health Plan, in Plaintiff's capacity as an MA organization or otherwise, has any legal right to enforce the MSP law or to recover from a primary plan.  Defendant, Mid-Century Insurance Company, refuses to honor its obligations under the MSP to pay as primary or to make appropriate reimbursement.

102.     Plaintiff, Cariten Health Plan, requests a declaratory judgment that:

(a)     The "no fault" (No Fault, Personal Injury Protection ("PIP"), Med Pay or Guaranteed Benefits) coverage issued by Defendant, Mid-Century Insurance Company, is primary to Medicare, including Medicare benefits advanced by MA organizations such as Plaintiff, Cariten Health Plan;

(b)     When an MA organization such as Plaintiff, Cariten Health Plan, has advanced Medicare benefits in circumstances in which its payments are made secondary pursuant to 42 U.S.C. § 1395y(b)(2) and § 1395w-22(a)(4), Defendant, Mid-Century

Insurance Company, is obligated to make appropriate reimbursement to the MA organization;

(c)     Defendant, Mid-Century Insurance Company, may not avoid its obligations under the MSP law by claiming that, "The HMO's and Medicare + Choice Organizations statutes permit, but do not mandate recovery in MSP situations"; in other words, by claiming that, because federal law says Medicare organizations "may" recover, therefore they may not recover;

(d)     Defendant, Mid-Century Insurance Company, may not avoid its obligations under the MSP law by claiming that its coverage is first party coverage and therefore not subject to "subrogation."

103.     Declaratory relief is necessary and appropriate because, Defendant, Mid-Century Insurance Company, routinely takes the position that its "no fault" (No Fault, PIP, Med Pay, and Guaranteed Reimbursement) plans are not obligated to pay as primary or make appropriate reimbursement to Medicare Advantage organizations or otherwise comply with the federal Medicare Secondary Payer law, when a Medicare beneficiary obtains Medicare benefits through the Medicare Advantage option instead of through the Original Medicare fee-for-service option. In doing so, Defendant, Mid-Century Insurance Company, shifts expenses, which under its policies and the MSP law are its responsibility, to MA organizations and ultimately to the Medicare Trust Funds and to elderly and disabled Medicare Advantage enrollees.

## COUNT TWO

### PRIVATE CAUSE OF ACTION FOR DOUBLE DAMAGES

104.     Plaintiff, Cariten Health Plan, incorporates by reference the allegations of paragraphs 1 through 103 of the Complaint as if set forth herein.

105.     Plaintiff, Cariten Health Plan, made payments of Medicare benefits for items and services required by Enrollee 1 as a result of her motor vehicle accident totaling $15,799.43.

106.     Defendant, Mid-Century Insurance Company, was the primary payer under 42 U.S.C. § 1395y(b)(2) and § 1395w-22(a)(4) with respect to the medical expenses incurred by Enrollee 1 as a result of her accident, but were paid by Plaintiff, Cariten Health Plan.

107.     At the time it made payment for these expenses, Plaintiff, Cariten Health Plan, did not know that primary coverage provided by Defendant, Mid-Century Insurance Company, existed.  These payments were, therefore, conditional.  *See* 42 C.F.R. § 411.21.

108.     Congress has "established a private cause of action for damages (which shall be in an amount double the amount otherwise provided) in the case of a primary plan which fails to provide for primary payment (or appropriate reimbursement)" in accordance with the MSP law. 42 U.S.C. § 1395y(b)(3)(A).

109.     Defendant, Mid-Century Insurance Company, did not make primary payment to Enrollee 1's providers for the items and services for which Plaintiff, Cariten Health Plan, advanced payments.

110.     Defendant, Mid-Century Insurance Company, did not make appropriate reimbursement to Plaintiff, Cariten Health Plan, for the items and services for which Plaintiff, Cariten Health Plan, advanced payments.

111.     Plaintiff, Cariten Health Plan, brings this action under the private cause of action established by 42 U.S.C. § 1395y(b)(3)(A) to recover from Defendant, Mid-Century Insurance Company, double damages for its failure to pay as primary or to make appropriate reimbursement.

112.     Under the private cause of action established by 42 U.S.C. § 1395y(b)(3)(A), Plaintiff, Cariten Health Plan, is entitled to recover "an amount double the amount otherwise

provided." Plaintiff, Cariten Health Plan, made payments of Medicare benefits in the amount of $15,799.43 and is entitled to recover double that amount, $31,598.86, from Defendant, Mid-Century Insurance Company.

**COUNT THREE**

**ACTION FOR CHARGES**

113.     Plaintiff, Cariten Health Plan, reincorporates the allegations of paragraphs 1 through 112 of the Complaint as if set forth herein.

114.     Notwithstanding any other provision of law, a Medicare Advantage plan may charge, or authorize the provider to charge, for items and services provided to its enrollees in circumstances in which the Medicare Secondary Payer law, 42 U.S.C. § 1395y(b)(2), makes Medicare the secondary payer behind any law, plan or policy described in § 1395y(b)(2). *See* 42 U.S.C. § 1395w-22(a)(4) (the Medicare Advantage "right-to-charge" law).  CMS interprets the term to "charge" in the *right-to-charge* law to mean to "bill" – thus giving the term its common sense meaning. *See* 42 C.F.R. § 422.108(c).

115.     The Medicare Advantage organization or provider may charge in accordance with the charges allowed under a law, plan, or policy.  *See* 42 U.S.C. § 1395w-22(a)(4); 42 C.F.R. § 422.108.

116.     Defendant, Mid-Century Insurance Company, advised Plaintiff's, Cariten Health Plan, representative that, "We have a first party contract with our insured to pay reasonable expenses incurred for necessary medical expenses resulting from a motor vehicle accident."

117.     The reasonable expenses for the services provided Enrollee 1 were the amounts stated on the providers' bills.  Those charges totaled $55,378.70.

118.     In accordance with the charges allowed under the Mid-Century Insurance Company policy, Plaintiff, Cariten Health Plan, has charged Defendant, Mid-Century Insurance Company,

34

for the medical expenses resulting from the injuries sustained by Enrollee 1 in her October 17, 2012 motor vehicle accident.

119.    Plaintiff, Cariten Health Plan, brings this Count under federal common law to collect from Defendant, Mid-Century Insurance Company, the charges authorized by federal law.

120.    Plaintiff, Cariten Health Plan, does *not* proceed on the theory that § 1395w-22(a)(4) implies a federal cause of action.  However, Plaintiff, Cariten Health Plan, *does* proceed on the theory that Congress expected that MA organizations would be able to collect their charges. When Congress enacted § 1395w-22(a)(4), Congress did not intend to make it federal law that, "[*n*]*otwithstanding any other provision of law,*" an MA organization may, in circumstances where its payment responsibility "is made secondary pursuant to" the MSP law, *ask politely to be paid*.

121.    Although it is clear that Federal law allows an MA organization to charge a No Fault insurer, it is not clear that State law authorizes an MA organization to sue to collect its charges from a No Fault or other insurer.  Indeed, Defendant, Mid-Century Insurance Company, contends that, "We have found no authority that will allow a health insurance carrier or their representative to claim a direct cause of action against a first party automobile insurance carrier providing PIP [Personal Injury Protection], Med Pay or Guaranteed Benefits."  *Supra* ¶ 95.

122.    If State law does not provide the means by which to enforce a federal law, designed to protect the solvency of the federal Medicare program, then federal common law must provide the means.  Federal common law, moreover, is appropriate because Medicare is "a federal program operated under Federal rules.  State laws do not, and should not, apply, with the exception of state licensing laws or state laws related to plan solvency." H.R. Rep. No. 108-391, at 557 (2003) (Conf. Rep.).

123.     Federal common law also applies because a significant conflict exists between federal policy or interest and state policy or interest.  The MSP statute was designed to curb skyrocketing health costs and preserve the fiscal integrity of the Medicare system.  *Fanning v. United States*, 346 F.3d 386, 388-389 (3d Cir. 2003); *Zinman v. Shalala*, 67 F.3d 841, 845 (9th Cir. 1995).[8]  There is significant conflict between these federal interests and the operation of Tennessee law, which was not designed to protect the federal treasury.

124.     Consistent with the Federal policy or interest of reducing the cost of the Medicare program, the federal laws and regulations that authorize an MA organization to charge a No Fault insurer or other primary plan "supersede any State laws, regulations, contract requirements, or other standards that would otherwise apply to MA plans." 42 C.F.R. § 422.108(f).  Medicare, for example, "may recover without regard to any claims filing requirements that the [No Fault] insurance program or plan imposes on the beneficiary or other claimant such as a time limit for filing a claim or a time limit for notifying the plan or program about the need for or receipt of services." 42 C.F.R. § 411.24(f)(1).  In contrast, to the extent that State law authorizes an MA organization or other health plan to charge a No Fault plan at all, State law requires adherence to the limitations imposed by State laws and regulations and by the contract requirements of the No Fault policy.

125.     Even though the Medicare *right-to-charge* statute makes no mention of subrogation, Defendant, Mid-Century Insurance Company, contends that the Medicare *right-to-charge* provision merely authorizes an MA organization to put subrogation language in its

_____

[8] *See also Bio-Medical Applications of Tennessee, Inc. v. Central States,* 656 F.3d 277 (6th Cir. 2011), *cert. den.*, *Central States v. Bio-Medical in re Tenn.,* 132 U.S. 1087 (2012); *Farmers Ins. Exch. v. Forkey*, 764 F. Supp. 2d 1205 (D. Nev. 2010); *Smith v. Farmers Ins. Exch. and Mid-Century Insurance Company*, 9 P.3d 335, 341 (Colo. 2000).

agreement with the MA enrollee and to enforce that subrogation provision in State court, under State law, if it can. Defendant, Mid-Century Insurance Company, further contends that because its coverage is first party coverage, Plaintiff, Cariten Health Plan, would have no right to subrogation in any event, or it states in its form letters, "The circumstances do not support a valid subrogation lien." In short, Defendant, Mid-Century Insurance Company, contends that Congress afforded MA organizations only one remedy, i.e., subrogation under State law, and that in doing so, Congress in fact afforded MA organizations no remedy at all, because subrogation does not apply to No Fault and other first party insurance.

126.    Even if State law permitted subrogation against No Fault and other first insurance, the position espoused by Defendant, Mid-Century Insurance Company, would still create a direct collision between Federal and State law. Consistent with the Federal policy of shifting costs from the Medicare program, Federal policy requires that Medicare be paid first, even if the Medicare beneficiary has not been "made whole." 42 C.F.R. § 411.24(c). *See Hadden v. United States of America*, 661 F.3d 298 (6th Cir. 11/21/2011); *Zinman v.Shalala*, 67 F.3d 841 (9th Cir. 1995). Consistent with the State interest in protecting accident victims, State law in Tennessee does not permit a health plan to recover through subrogation unless the injured person has been "made whole." *York v. Sevier County Ambulance Auth*., 8 S.W.3d 616 (Tenn. 1999).

127.    Alternatively, Plaintiff, Cariten Health Plan, brings a state law claim for indemnity, or under other state law, to collect from Defendant, Mid-Century Insurance Company, the charges authorized by federal law. *See, e.g.*, *Southern Coal & Coke Co. v. Beech Grove Mining Co.*, 53 Tenn. App. 108, 116 (Tenn. Ct. App. 1963) (holding that plaintiff is entitled to indemnification from a defendant that had a "primary duty" to pay money to the government under a federal statute but refused to make such payment, thereby causing the plaintiff to make the payment instead).

## COUNT FOUR

## ACTION FOR RESTITUTION OR UNJUST ENRICHMENT

128. Plaintiff, Cariten Health Plan, incorporates by reference the allegations of paragraphs 1 through 127 of the Complaint as if set forth herein.

129. Mistaken performance of another's obligation gives the performing party a claim in restitution against the obligor to the extent of the benefit mistakenly conferred on the obligor. Restatement of Law 3d, Restitution and Unjust Enrichment, §§ 1, 7.

130. Plaintiff, Cariten Health Plan, paid the claims for the medical treatment provided to Enrollee 1 before learning that medical treatment was required under circumstances in which Defendant, Mid-Century Insurance Company, was also responsible for payment of the reasonable cost of that medical treatment and therefore, under the MSP law, was the primary payer. These payments were "conditional" payments under the MSP Act, 42 C.F.R. § 411.21.

131. Plaintiff, Cariten Health Plan, has also likely made conditional payments for medical treatment provided to other MA enrollees for whom Defendant, Mid-Century Insurance Company, was also responsible for payment of the reasonable cost of that medical treatment and therefore, under the MSP law, was the primary payer.

132. By paying the claims for medical expenses for which Defendant, Mid-Century Insurance Company, was responsible under its no fault, medical payment or other first party coverage, under circumstances in which the Defendant, Mid-Century Insurance Company coverage was primary, Plaintiff, Cariten Health Plan, mistakenly discharged an obligation of Defendant, Mid-Century Insurance Company, to its insureds, who were also Medicare beneficiaries enrolled in Medicare Advantage plans administered by Plaintiff, Cariten Health Plan.

133. Plaintiff, Cariten Health Plan, conferred a benefit on Defendant, Mid-Century Insurance Company, by discharging the providers' claims for the medical expenses incurred by

Defendant, Mid-Century Insurance Company's insureds for which Defendant, Mid-Century Insurance Company, was the primary plan and primary obligor.

134.     Plaintiff, Cariten Health Plan, also conferred a benefit on Defendant, Mid-Century Insurance Company, by discharging the providers' claims for the medical expenses incurred by Defendant's insureds *at rates which Plaintiff, Cariten Health Plan, had negotiated with the providers or at Medicare rates*.  Those rates were significantly lower than those providers' billed charges. Those rates were also significantly lower than the rates that should have been paid by Defendant, Mid-Century Insurance Company.

135.     For example, the providers' charges for Enrollee 1 were $55,378.70, which were discharged under the Cariten Medicare Advantage plan by the payment of $15,799.43 by Plaintiff, Cariten Health Plan, and $315.00 by Enrollee 1.

136.     In short, Plaintiff, Cariten Health Plan, conferred a substantial benefit on Defendant, Mid-Century Insurance Company, not only by the payment of claims for which Defendant was primary payer, but also by affording Defendant the opportunity to "free ride" on the Cariten rates.  Despite these substantial benefits, Defendant, Mid-Century Insurance Company, refused to make restitution to Plaintiff, Cariten Health Plan.  Defendant, Mid-Century Insurance Company, also failed or refused to reimburse its insureds for the copayments, coinsurance and/or deductibles they paid under the Medicare Advantage plans.

137.     Defendant, Mid-Century Insurance Company, is aware that it and its affiliates obtain a significant benefit from the discharge of their obligations by Medicare Advantage plans, and would benefit handsomely even if they reimbursed Medicare Advantage plans (as required by law) and indemnified their insureds for the amounts their insureds are out-of-pocket.

39

138.     Defendant, Mid-Century Insurance Company, however, has made a calculated decision that it would profit even more by refusing to reimburse the conditional payments made by Plaintiff, Cariten Health Plan, and other MA organizations, and by refusing to reimburse the copayments, coinsurance and/or deductibles its insureds paid.

139.     It would be unconscionable and unjust to allow Defendant, Mid-Century Insurance Company, to retain the benefit conferred on it by Plaintiff, Cariten Health Plan, because it would allow Defendant to profit from flaunting the Medicare Secondary Payer law.

140.     It would be unconscionable and unjust to allow Defendant, Mid-Century Insurance Company, to retain the benefit conferred on it by Plaintiff, Cariten Health Plan, for an additional reason:   Allowing Defendant to retain the benefit of the payments by Medicare Advantage organizations, when Defendant is the primary payer, would undermine the coordination of benefits scheme created by Congress when it enacted the Medicare Secondary Payer laws. It would encourage other primary plans to shirk their responsibilities under the MSP law.  And, it would encourage MA organizations to deny payments whenever there is *any* possibility, however remote, that the enrollee's injuries may have been the result of a compensable accident, with the result that payments to providers will be delayed, and elderly Medicare beneficiaries left concerned about who will pay their providers and whether their providers will continue to treat them.

141.     It would be unconscionable and unjust to allow Defendant, Mid-Century Insurance Company, to retain the benefit conferred on it by Plaintiff, Cariten Health Plan, because it would allow Defendant to benefit at the expense of the Medicare Trust Funds and Medicare Advantage enrollees.  When MA organizations recover payments made in mistake, the effect is to reduce their medical expense.  Their medical expenses are factored into subsequent year's bids.  Lower medical expenses in the base year lower the expense of Medicare Advantage plans to the Medicare Trust

Funds and MA enrollees in the bid year. Thus, lower medical expenses reduce the capitation paid by the Medicare Trust Funds and thus help preserve the assets of the Medicare Trust Funds. Lower medical expenses also mean lower premiums and more benefits for Medicare Advantage enrollees, many of whom are low income. It would be unconscionable and unjust to allow Defendant and its corporate affiliates to shift medical expenses that federal law requires the Farmers Group of Companies® to bear to MA organizations and ultimately to the Medicare Trust Funds and to MA enrollees.

142. Plaintiff, Cariten Health Plan, is entitled to restitution and damages for unjust enrichment under federal common law and/or state law. *See, e.g.*, *Tennessee ex rel. Leech v. Dole*, 749 F.2d 331, 336 (6th Cir. 1984) (holding that federal common law of unjust enrichment applies to claims "arising from legal relationships created but not fully defined or delineated by federal constitutional and statutory law").

## COUNT FIVE

## ACTION FOR ACCOUNTING

143. Plaintiff, Cariten Health Plan, incorporates by reference the allegations of paragraphs 1 through 142 of the Complaint as if set forth herein.

144. The Medicare Secondary Payer program was intended to shift expenses from the Medicare program to private payers like Defendant, Mid-Century Insurance Company. But like any coordination of benefits of regime, the MSP regime is also designed to avoid delays in payment to providers due to disputes over which plan is primary. It does that by requiring Medicare to advance conditional payments until the disputed responsibility of the primary plan is determined. *See, e.g.*, CMS, *Medicare Managed Care Manual*, Chap. 4, § 130.3 (Rev. 107, 06-22-12) ("In the case of the presence of workers compensation, no-fault and liability insurance (including self-insurance), Medicare makes conditional payments if the other insurance does not pay promptly.

41

These conditional payments are subject to recovery when and if the other insurance does make payment. MAOs cannot withhold primary payment unless there is a reasonable expectation that another insurer will actually promptly pay primary to Medicare.")

145.    A coordination-of-benefits regime requires plans to share information between the primary plan and secondary plan and to act in good faith. This relationship may be characterized as a fiduciary relationship or simply as the special relationship imposed on parties to any coordination of benefits scheme. Alternatively, when the secondary plan has conditionally paid benefits that should have been paid by the primary plan, the law imposes an implied contract on the primary plan to make appropriate reimbursement to the secondary plan.

146.    Tennessee Courts have "inherent jurisdiction in equity over a suit for accounting, a suit involving claims and counterclaims, where the accounts are too complicated to be dealt with in a court of law." *Greene County Union Bank v. Miller*, 18 Tenn. App. 239, 244 (Tenn. Ct. App. 1934); *see also Hewgley v. Trice*, 51 Tenn. App. 452, 455-456 (Tenn. Ct. App. 1962) ("It is fundamental that a suit for accounting, involving claims and counterclaims, where the accounts are complicated, is a suit 'of an equitable nature.'"). Such suits may be heard by a court of law exercising the "power to order and take all proper accounts, and otherwise to perform the functions of a chancery court." Tenn. Code Ann. § 16-10-111. *See also Lynn v. Sure-Fire Music Co.*, 237 Fed. Appx. 49, 54 (6th Cir. 2007) (plaintiff in suit under Tennessee law sought "the familiar common law equitable relief of a court-ordered accounting").

147.    An equitable accounting of the amounts owed Plaintiff, Cariten Health Plan, by Defendant, Mid-Century Insurance Company, is proper because the facts and accounts presented are so complex that adequate relief may not be obtained at law.

148.    Defendant, Mid-Century Insurance Company, contends that Plaintiff, Cariten Health Plan, does not have "subrogation" rights against its no fault and other first party coverage, refusing to acknowledge that Plaintiff, Cariten Health Plan, is not asserting subrogation, but rather seeking compliance with the MSP law.

149.    Once this spurious contention is disposed of, Defendant, Mid-Century Insurance Company, should pay the amounts it owes.  Plaintiff, Cariten Health Plan, however, expects that Defendant, Mid-Century Insurance Company, may assert additional arguments, with the intent, or at least the effect, that adequate relief at law would be exceedingly difficult or impossible.  For example:

150.    **Relatedness**:  Defendant, Mid-Century Insurance Company, may assert that it is not obligated to pay as primary or to make appropriate reimbursement to Plaintiff, Cariten Health Plan, on the ground that the medical expenses paid by Plaintiff, Cariten Health Plan, were not related to their insureds' accident.

151.    **Reasonableness of provider charges**: Defendant, Mid-Century Insurance Company, may assert that it was not obligated to pay as primary or to make appropriate reimbursement of the amount of the providers' charges on the ground that the providers' charges were not reasonable, customary or usual charges.

152.    **Policy Limits Exhaustion**.  Defendant, Mid-Century Insurance Company, may assert that it is not required to pay the full amount owed to Plaintiff, Cariten Health Plan, because that amount, by itself or combined with other amounts the Defendant has paid, would exceed the "no fault" (or other first party) limits of its policy.

153.    **Priority of claims:**  If, Defendant, Mid-Century Insurance Company, claim that its policy limits are or will be exhausted, difficult questions may be presented as to whether

43

Defendant, Mid-Century Insurance Company, made payments to others after Plaintiff, Cariten Health Plan, demanded payment, and if so, whether Defendant, Mid-Century Insurance Company, made such payments at their own risk.

154. **Payment to another**:  Defendant, Mid-Century Insurance Company, may assert that it was not obligated to make appropriate reimbursement to Defendant, Cariten Health Plan, on the ground that it made payment to the provider, the insured or to someone else, raising issues about whether Medicare's claim to reimbursement enjoys priority and whether any such provider or other payee may have received duplicate payments.

155. **Other Coverage:**  Defendant, Mid-Century Insurance Company, may assert that it was not obligated to pay as primary or to make appropriate reimbursement on the ground that other insurance coverage, of which Plaintiff, Cariten Health Plan, is presently unaware, is primary to its coverage.

156. **Lack of Signed Release**:  Defendant, Mid-Century Insurance Company, may assert that it cannot release information to Plaintiff about settlements that it entered into with Plaintiff's enrollees without a signed release from the patient, thereby preventing Plaintiff from learning about settlements that trigger Defendant's obligations to reimburse conditional payments.

157. Plaintiff, Cariten Health Plan, believes that any such assertions have been waived, or are not valid defenses, but if allowed by the Court, these issues would require detailed analysis and calculations that would be beyond what any jury could be expected to perform.

158. Plaintiff, Cariten Health Plan, is entitled to an accounting from Defendant, Mid-Century Insurance Company, of the appropriate reimbursement due Plaintiff, Cariten Health Plan, for claims that Plaintiff, Cariten Health Plan, paid, but for which "no fault" insurance (including

PIP, Medical Payments and Guaranteed Benefits insurance), provided by Defendant, Mid-Century Insurance Company, was primary.

## PRAYER FOR RELIEF

Based on the above claims, Plaintiff, Cariten Health Plan, seeks the following relief:

(1)     Declaratory relief;

(2)     Double damages under 42 U.S.C. § 1395y(b)(3)(A); or, *in the alternative to double damages*,

(3)     Its charges (notwithstanding any other provision of law, as provided in 42 U.S.C. § 1395w-22(a)(4) and 42 C.F.R. § 422.108(f)); and

(4)     Restitution for all claims under no fault, medical payments or other similar first party coverage, under policies issued by Defendant, Mid-Century Insurance Company, that Plaintiff, Cariten Health Plan, paid without knowledge that Defendant, Mid-Century Insurance Company, also provided coverage for the medical expense and was the primary payer under the MSP law;

(5)     For an accounting of the reimbursement due Plaintiff, Cariten Health Plan, from Defendant, Mid-Century Insurance Company, with respect to claims for medical expense for which Plaintiff, Cariten Health Plan, advanced Medicare benefits and is entitled to appropriate reimbursement from Defendant, Mid-Century Insurance Company.

(6)     Pre- and post-judgment interest; and

(7)     Such other relief the Court deems proper.

**WHEREFORE**, Plaintiff, Cariten Health Plan Inc., prays that the Court enter judgment on behalf of Plaintiff, Cariten Health Plan Inc., and against Defendant, Mid-Century Insurance Company, and award Plaintiff, Cariten Health Plan Inc., all requested relief.

Respectfully submitted this 8th day of October 2014,

By:     /s/ Al Holifield_____
        Al Holifield, Esq.  (BPR# 015494)
        Holifield & Associates, PLLC
        11907 Kingston Pike, Suite 201
        Knoxville, Tennessee  37934
        865-566-0115 phone
        865-566-0119 fax

        Michael P. Abate (application for *Pro Hac Vice* to be filed)
        Dinsmore & Shohl LLP
        101 South Fifth St., Suite 2500
        Louisville, KY 40202
        502-540-2359 phone
        502-585-2207 fax

7289942v2

46